IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DONALD G. CRAIG, III,<br><br>                    Plaintiff,<br><br>        v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>                    Defendant. | HONORABLE JEROME B. SIMANDLE<br><br><br>Civil Action<br>No. 13-4454 (JBS)<br><br><br>**OPINION** |

APPEARANCES:

Philip Wolf, Esq.
WOLF & BROWN, LLC
228 Kings Highway East
Haddonfield, NJ 08033
     Attorney for Plaintiff Donald G. Craig, III

Paul J. Fishman
UNITED STATES ATTORNEY
     By:  Sixtina Fernandez, Esq.
          Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278
     Attorney for Defendant Commissioner of Social Security

**SIMANDLE, Chief Judge:**

**I. INTRODUCTION**

     This matter comes before the Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c) for review of the final decision of the Commissioner of the Social Security Administration, denying Plaintiff Donald G. Craig, III's application for Disability Insurance Benefits under Title II of the Social Security Act

(the "Act") and Supplemental Security Income under Title XVI of the Act.

In a written decision, Administrative Law Judge Frederick Timm ("ALJ") determined that Plaintiff, who suffers from chronic back pain and depression, was not disabled under the Act. Plaintiff challenges the ALJ's decisions at steps two and four of the required five-step analysis. The principal issues to be determined are (1) whether substantial evidence supports the ALJ's determination of Plaintiff's residual functional capacity, and (2) whether the ALJ erred at step two of the sequential process by failing to include a more comprehensive list of impairments that qualify as "severe." Plaintiff primarily argues that the ALJ failed to properly weigh the evidence and discuss certain probative medical records when determining Plaintiff's residual functional capacity.

For the reasons discussed below, the Court will affirm the ALJ's ruling.

**II. BACKGROUND**

**A. Procedural history**

Plaintiff filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on December 29, 2009. The Commissioner denied both claims initially on March 23, 2010, and upon reconsideration on November 3, 2010. (R. at 124, 140.) On December 30, 2010, Plaintiff filed a

2

written request for a hearing. (R. at 145.) Accordingly, the ALJ held a hearing on July 15, 2011, during which Plaintiff testified and was represented by counsel. (R. at 26, 34–78, 131.) In addition, Louis P. Szollosy, a certified rehabilitation counselor, testified in his capacity as an impartial vocational expert. (R. at 78–104.) In a written opinion issued September 9, 2011, the ALJ held that Plaintiff was not disabled within the meaning of the Act and denied his application for Social Security benefits. (R. at 7, 10–20.) On May 28, 2013, the Appeals Council denied Plaintiff's request for review. (R. at 1.) Plaintiff timely filed this action, which the Commissioner opposes.

**B. Facts**

Plaintiff is a veteran who served as a post office clerk in the Marine Corps. (R. at 317.) He alleges disability since February 25, 2009, due to physical limitations caused by chronic back pain, as well as psychological limitations caused by depression and anxiety. The record in this case is voluminous and contains medical evidence from various sources as well as testimony from Plaintiff. The Court notes the relevance of the following medical and observational evidence.

## 1. Medical evidence

### a. Physical limitations

Plaintiff suffers from persistent hip, neck, and lower back pain. To treat this pain, in 2006, his family physician referred him to Dr. Bruce Hairston, a board certified physiatrist. (R. at 437.) After performing several tests of basic movement, Dr. Hairston noted that Plaintiff experienced pain upon motion of his right hip, as well as tenderness in several muscles of his hip region. (R. at 436.) Dr. Hairston ordered a MRI, which revealed a disk protrusion and spondylolisthesis in Plaintiff's lower back. (R. at 434.) Despite these conditions, Plaintiff had normal strength and coordination through his lower limbs. (Id.) Dr. Hairston treated Plaintiff's conditions with trigger point injections, and noted that Plaintiff reported "80% to 90% relief" from the injections. (R. at 398). Dr. Hairston prescribed Plaintiff medications, including Percocet and Oxycontin, and continued to treat Plaintiff through May 11, 2010. (R. 394–437.) Plaintiff also received treatment for his back pain at the VA Medical Center ("VAMC") in Wilmington, Delaware. The Department of Veterans Affairs deemed Plaintiff to have a 40% aggregate disability caused by several ailments, including tinnitus and various knee problems. (R. at 544, 547.) Further, the VAMC's pain management coordinator diagnosed Plaintiff with degenerative disc disease with stenosis. (R. at

4

765.) Progress notes from the VAMC show a record of ongoing evaluation and treatment as Plaintiff's pain would intermittently exacerbate and recede.

In 2008, Dr. Andrew Glass, a neurosurgeon, performed a physical examination on Plaintiff. (R. at 346-47.) Dr. Glass recommended that Plaintiff have another MRI and follow-up with his office. (R. at 347.) There is no indication in the record, however, that Plaintiff followed up with Dr. Glass. Further, there is no indication in the record that Dr. Glass provided any medical opinion as to Plaintiff's residual functional capacity or ability to work.

In 2009, Dr. Riva Ponnappan, an orthopedic surgeon, examined Plaintiff and diagnosed him with degenerative disc disease, stenosis, and isthmic spondylothesis. (R. at 392.) In addition to diagnosing Plaintiff, Dr. Ponnappan offered to perform corrective surgery to alleviate Plaintiff's back problems. (R. at 390-92.) Dr. Ponnappan's records show that during a July 30, 2009 follow-up visit, Plaintiff indicated that he felt surgery might be the best option for treating his back pain. (R. at 390.)

On March 9, 2010, state agency medical consultant Dr. Zwi Kahanowicz evaluated Plaintiff's residual functional capacity regarding his physical limitations. Dr. Kahanowicz determined that, in an eight-hour workday, Plaintiff could sit about six

5

hours, stand/walk about six hours, and lift/carry twenty pounds
occasionally and ten pounds frequently. (R. at 598.) Dr.
Kahanowicz also concluded that Plaintiff could frequently climb
ramps and stairs, balance, stoop and kneel, and could
occasionally climb ladders, ropes and scaffolds. (R. at 600.) On
August 18, 2010, another state agency consultant and orthopedic
specialist, Dr. A. M. Pirone, reviewed the record and agreed
with Dr. Kahanowicz's opinion regarding Plaintiff's residual
functional capacity. (R. at 727.)

### b. Psychological limitations

In addition to his physical limitations, Plaintiff suffers
from depression and related psychological issues. He has
received treatment from several psychiatric professionals at the
VAMC.

Dr. Jane Chamberlain, a board certified psychiatrist,
diagnosed Plaintiff with dysthymia and cannabis dependence and
prescribed medications including Wellbutrin. (R. at 563.) Dr.
Chamberlain's notes indicate that Plaintiff exhibited symptoms
of "chronic depression, chronic anxiety, panic, social phobia,
poor impulse control, sleeping too much (10hrs) etc." (R. at
567.) The same notes also reflect that Plaintiff stated he was
"bright, learns quickly and can do anything [he puts his] mind
to." (Id.) (internal citations omitted).

Ms. Melonie Boileau, a psychiatric social worker, provided Plaintiff with psychotherapy beginning in October, 2009. Ms. Boileau categorized Plaintiff's psychological conditions as "impulse control/anger mgt issues, marijuana abuse and employment issues." (R. at 574.) Her notes reflect comprehensive discussions with Plaintiff about his personal life, employment situation, social difficulties, and mental wellbeing. (See, e.g., R. at 569, 575.)

Another psychiatric social worker, Ms. Jamie Kazmarck, also treated Plaintiff with supportive psychotherapy. Ms. Kazmarck's progress notes reflect several discussions with Plaintiff about job prospects and possibly pursuing a bachelor's degree in business. (R. at 689.) Notably, Ms. Kazmarck evaluated Plaintiff's residual functional capacity and rated as "poor" his ability to interact with supervisors and deal with work stresses. (R. at 827–28.) Additionally, Ms. Kazmarck rated as "fair" Plaintiff's ability to follow work rules, use judgment, function independently, maintain attention and concentration, and behave in an emotionally stable manner. (Id.) Ms. Kazmarck rated as "good" Plaintiff's ability to understand, remember and carry out complex or detailed job instructions, relate to coworkers, deal with the public, and demonstrate reliability. (Id.)

On March 19, 2010, Dr. Wayne Tillman, a psychologist and state agency medical consultant, reviewed the record at the request of the administration and evaluated Plaintiff's residual functional capacity regarding psychological limitations. Dr. Tillman concluded that Plaintiff has some moderate restrictions with regards to sustained concentration and persistence, social interaction, and adaptation. (R. at 620–21.) Despite these restrictions, Dr. Tillman concluded that Plaintiff is able to understand and execute simple instructions and can adapt in work-like settings. (R. at 622.) On October 21, 2010, another state agency consultant, Dr. Herman Huber, reviewed the record and seconded this opinion. (R. at 728.)

### 2. Plaintiff's testimony

At the administrative hearing, Plaintiff testified that he left his job at the post office because the lifting requirements were too demanding and he was physically unable to keep up. (R. at 35.) Plaintiff testified to experiencing frequent lower back pain and numbness down his right leg. (R. at 44.) Plaintiff testified that these conditions prevent him from sitting, standing, or walking for prolonged periods of time. (Id.) Further, Plaintiff attested to suffering from depression as a result of his physical condition, stating that he has become socially withdrawn and has lost all his friends. (R. at 51–54.) With regards to daily living, Plaintiff testified that he is

8

limited to watching television, performing light housework, and cooking with assistance from his mother and social worker. (R. at 57.)

Plaintiff's work history includes positions as a post office clerk, an administrative clerk, a swimming pool service technician, a security officer, and as a surveillance system monitor. These positions require varying levels of skill and physical exertion as performed in the national economy, ranging from unskilled and sedentary to semi-skilled and medium requisite exertion. At the hearing, Plaintiff acknowledged a history of substance abuse and admitted to smoking marijuana once or twice per month. (R. at 56.)

**C. Legal framework**

For purposes of determining a plaintiff's entitlement to benefits, the Act defines a "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). A claimant is considered unable to engage in any substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education,

and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The disability determination is comprised of five sequential steps:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity . . . . If a claimant is found to be engaged in substantial activity, the disability claim will be denied . . . .

> In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment . . . . If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.

> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work . . . . If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

> Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work . . . . If the claimant is unable to resume her former occupation, the evaluation moves to the final step.

> At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability . . . . The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled . . . .

<u>Plummer</u>, 186 F.3d at 428 (citations omitted).

**D. ALJ decision**

The ALJ began the five-step analysis by determining that Plaintiff has not engaged in any substantial gainful activity since his claimed disability onset date of February 25, 2009. (R. at 12.) At step two, the ALJ found that Plaintiff suffers from "severe" impairments of degenerative disc disease with stenosis and depression. (<u>Id.</u>) The ALJ concluded that these impairments were not sufficiently severe to qualify for per se eligibility under step three. (R. at 13.)

At step four, the ALJ determined that Plaintiff had the residual functional capacity to perform unskilled, sedentary work. (R. at 13.) The ALJ qualified his decision with the following limitations:

> [Plaintiff] would need the option to change positions every 15 minutes while continuing tasks. Further, he can only occasionally climb ramps and stairs, balance, stoop or kneel, and can never crouch, crawl, or climb ladders, ropes or scaffolds. In addition, he must avoid concentrated exposure to extreme heat, cold, wetness and humidity. Further, he is limited to unskilled tasks and to goal-oriented rather than production-paced tasks. Further, he requires a stable workplace with few, if any, changes of setting, processes and tools. Finally, the claimant is limited to only occasional interaction with co-workers, supervisors, and the general public.
>
> Using parts "A" and "B" of the psychiatric review technique, the claimant's depression is characterized by anger management issues, impulsivity and feelings of hopelessness. With respect to resulting functional limitations, the claimant has mild restrictions of

11

activities of daily living, moderate difficulties in
maintaining social functioning, moderate difficulties
maintaining concentration, persistence or pace, and no
episodes of decompensation. The evidence does not
establish the presence of the "C" criteria under
section 12.04.

(Id.) The ALJ determined that, in light of Plaintiff's current
residual functional capacity, Plaintiff cannot perform any of
the jobs which he has previously held. (R. at 18.)

At step five, the ALJ relied on testimony by the vocational
expert to conclude that, although Plaintiff can no longer
perform any of the jobs he previously held, he can still perform
a significant number of jobs that currently exist in the
national economy. (R. at 18-19.) The ALJ explained that this
determination followed a consideration of the entire record and
the ALJ referred to medical records from Plaintiff's treating
physicians and the review of those records by state consultants.
(R. at 13-17.) Further, the ALJ noted consideration of progress
reports from Ms. Boileau, as well as Plaintiff's own testimony.
(Id. at 14, 16.)

### E. Plaintiff's arguments

Plaintiff's primary basis for appeal pertains to the ALJ's
evaluation of step four. Specifically, Plaintiff argues that the
ALJ's determination of Plaintiff's residual functional capacity
is not supported by substantial evidence. (Pl. Br. [Docket Item
19] at 28.) Plaintiff asserts that the ALJ committed several

12

errors in his consideration of the record which led to an improper finding of Plaintiff's residual functional capacity. (Id.) Plaintiff claims that the ALJ failed to discuss probative treatment notes and give proper weight to evidence in the record. Plaintiff contends that, had the ALJ properly considered all the evidence, Plaintiff's residual functional capacity would reflect that he cannot perform a sufficient number of jobs that currently exist in the national economy.

Additionally, Plaintiff claims that the ALJ erred at step two of the analysis. Plaintiff asserts that the ALJ's list of "severe" impairments, for purposes of satisfying step two of the disability determination, is under-inclusive and should incorporate isthmic spondylolisthesis, impulse control disorder, anxiety, and personality disorder. (Id. at 29, 50.)

**III. STANDARD OF REVIEW**

This Court reviews the Commissioner's decision pursuant to 42 U.S.C. § 405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Cunningham v. Comm'r of Soc. Sec., 507 F. App'x 111, 113–14 (3d Cir. 2012). Substantial evidence is defined as "more than a mere scintilla," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 400; Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d Cir. 2012). Therefore, if the ALJ's findings of fact are supported by

13

substantial evidence, the reviewing court is bound by those findings, whether or not it would have made the same determination. <u>Fargnoli</u>, 247 F.3d at 38.

The ALJ must set out a specific factual basis for each finding. <u>Baerga v Richardson</u>, 500 F.2d 309, 312 (3d Cir. 1974). "When a conflict in the evidence exists, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason. The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." <u>Plummer v. Apfel</u>, 186 F.3d 422, 429 (3d Cir. 1999). While a court should not "expect the ALJ to make reference to every relevant treatment note in a case," <u>Fargnoli</u>, 247 F.3d at 42, "[t]he ALJ's failure to address evidence in direct conflict with his/her findings . . . is erroneous." <u>Landeta v. Comm'r of Soc. Sec.</u>, 191 F. App'x 105, 110 (3d Cir. 2006).

**IV. DISCUSSION**

The first question on appeal is whether the ALJ's finding of residual functional capacity is supported by substantial evidence. The second issue is whether the ALJ erred in his determination at step two. For the following reasons, the Court finds that the ALJ's determination of residual functional capacity is supported by substantial evidence and that any error at step two of the sequential process was harmless.

## A. The ALJ's determination of residual functional capacity is supported by substantial evidence

At step four of the disability determination, the ALJ considers the claimant's residual functional capacity and past relevant work. 20 C.F.R. § 404.1520. If the claimant can still perform past relevant work, the inquiry ends and the claimant is deemed not disabled. Id. If, however, the ALJ finds that the claimant cannot perform past relevant work, the ALJ uses the claimant's residual functional capacity at step five to decide if the claimant can perform other work that is sufficiently available in the economy. § 404.1545(a)(5)(ii). When determining residual functional capacity, the ALJ considers how the limitations to claimant's physical abilities, mental abilities, and any other abilities might affect the claimant's capacity to do work on a regular and continuing basis. § 404.1545(b)-(d).

The ALJ must consider all relevant medical and non-medical evidence when determining an individual's residual functional capacity and must consider limitations imposed by all of an individual's impairments, even those that are not "severe." § 404.1545(a)(2)-(3). Such evidence includes, but is not limited to: medical records, lay evidence, the effects of symptoms reasonably attributed to a medically determinable impairment, and notable observations of limitations made by the claimant. § 404.1545(a)(3). Additionally, the ALJ's findings of residual

15

functional capacity must "be accompanied by a clear and satisfactory explanation of the basis on which it rests." Fargnoli, 247 F.3d at 41 (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)).

In this case, Plaintiff alleges that the ALJ's determination of Plaintiff's residual functional capacity is not supported by substantial evidence, and assigns the following errors to the ALJ: (1) improperly discounting the opinion of Ms. Kazmarck; (2) failing to consider the treatment records of Dr. Chamberlain; (3) failing to consider the treatment records of Ms. Boileau; (4) failing to give proper weight to the findings and opinions of Dr. Hairston; (5) failing to mention, discuss, and/or consider medical records created by Dr. Glass; (6) failing to mention, discuss, and/or consider medical records created by Dr. Ponnappan; (7) assigning great weight to the physical assessment of Dr. Kahanowicz; (8) assigning great weight to the psychiatric assessment of Dr. Tillman; and (9) failing to properly consider Plaintiff's subjective complaints of pain and other symptoms from a physical and non-exertional standpoint in accordance with SSR-96-7p. (Pl. Br. at 28-29.)

The Court will address these arguments in turn.

### 1. Dr. Glass and Dr. Ponnappan

Plaintiff contends that the ALJ erred by failing to reference the treatment records of Dr. Glass and Dr. Ponnappan

in his opinion. (Pl. Reply at 1–2.) Plaintiff generally asserts that the records of these physicians contain information that is probative to the residual functional capacity determination and that the ALJ's failure to discuss them warrants remand. (Id.)

At the outset, it is important to note that although the ALJ "must consider all relevant evidence when determining an individual's residual functional capacity," he is "not expect[ed] to make reference to every relevant treatment note in a case where the claimant . . . has voluminous medical records." Fargnoli, 247 F.3d at 41–42. If an ALJ's opinion omits relevant evidence in the record, a court may, upon its own review, affirm the ALJ's residual functional capacity determination as long as the missing references do not reflect conflicting probative evidence that would affect the outcome of the case. See Sharp v. Astrue, 228 F. App'x 228, 230 (3d Cir. 2007) (noting that ALJ opinion failed to discuss in detail certain aspects of claimant's treatment history, but finding no error where ALJ adequately explained the factual foundations for his findings and court's review of the purportedly omitted evidence revealed no "conflicting probative evidence that would affect the outcome of this case").

Plaintiff is correct that the ALJ did not discuss Plaintiff's treatment by Dr. Glass and Dr. Ponnappan in his opinion. The Court finds, however, that the ALJ was not required

17

to do so. The factual basis of the ALJ's opinion is clear, and the treatment records from these two physicians are merely duplicative of other evidence in the record that is clearly referenced by the ALJ. Accordingly, the ALJ did not err in omitting a discussion of Plaintiff's treatment by Dr. Glass and Dr. Ponnappan.

First, with regards to Dr. Glass, Plaintiff does not cite to any portion of Dr. Glass's records that conflicts with the ALJ's residual functional capacity determination. Plaintiff contends that references to "grade I anterolisthesis" and "bilateral lumbosacral point tenderness" require specific discussion by the ALJ. (Pl. Reply at 1.) This contention is insufficient. Neither of the aforementioned findings refute the ALJ's residual functional capacity conclusion, namely that Plaintiff could perform minor lifting, stand and walk for two hours, and sit for six hours.

Furthermore, after an independent review, this Court does not find any probative value in Dr. Glass's treatment records warranting discussion by the ALJ. Dr. Glass's notes amount to two pages in the record, neither of which contain evidence that directly contradicts the ALJ's residual functional capacity determination. (R. at 346-47.) Records from Dr. Glass, from a period prior to Plaintiff's alleged onset date, indicate only that Plaintiff needed to have another MRI conducted before a

proper diagnosis could be made. (R. at 347.) Such an observation is not relevant to Plaintiff's residual functional capacity and does not require explicit consideration by the ALJ.

The Court reaches the same conclusion with regard to the treatment records of Dr. Ponnappan. Plaintiff argues that these treatment records warranted discussion by the ALJ because they include Dr. Ponnappan's diagnosis of isthmic spondylolisthesis and stenosis. (Pl. Br. at 41.) According to Plaintiff, this diagnosis is probative because it identifies additional impairments that cause his functional limitations. (Pl. Reply at 2.) Plaintiff also claims that Dr. Ponnappan's records are "probative of claimant being more functionally limited." (Id.)

In their entirety, Dr. Ponnappan's notes reflect two physical examinations performed in 2009. Although these records might demonstrate a potential *cause* of Plaintiff's limitations, they do not speak to the *severity* of those limitations.[1] Dr. Ponnappan's notes do not address Plaintiff's ability to work; they simply reflect a diagnosis and an offer to perform corrective surgery. (R. at 390-93.) Importantly, the ALJ discussed spondylolisthesis and stenosis in considering the records of Dr. Hairston and the VAMC (R. at 14-15), and Plaintiff fails to explain how the ALJ's residual functional

[1] The severity of a claimant's limitations is the cornerstone inquiry for the determination of residual functional capacity, see generally 20 C.F.R. § 404.1520.

19

capacity determination would be affected had he discussed Dr. Ponnappan's diagnoses which appear elsewhere in the record. Despite his arguments to the contrary, Plaintiff has failed to demonstrate how the outcome would be different on remand after a more fulsome consideration of Dr. Ponnappan's treatment.

Furthermore, Plaintiff claims that "on the follow-up visit in July 30, 2009, Dr. Ponnappan indicated that surgery may be the best option for plaintiff . . . ." (Pl. Br. at 41.) A careful review of the record reveals that this is a mischaracterization. The records reflect that Dr. Ponnappan never suggested that surgery might be the best option, it was *Plaintiff* who made such an indication. (R. at 390) ("Overall, he comes to the point where he feels that surgery may be the best option for him.")[2] Plaintiff's personal opinions as to whether surgery was his best treatment option are clearly not probative to the ALJ's determination of Plaintiff's residual functional capacity.

The ALJ's determination is supported by his thorough discussion of the evidence in the record, which provides a sound basis for his findings as to Plaintiff's residual functional capacity. (R. at 12-13.) Plaintiff does not provide any evidence

_____

[2] In fact, the record is clear that Dr. Ponnappan expressly advised *against* surgery. (R. at 393) ("My recommendation would be to continue his nonoperative management if he can tolerate it.").

to the contrary. The ALJ is not required to refer to every treatment record of every physician to demonstrate that he considered the entire record. <u>Fargnoli</u>, 247 F.3d at 41–42. Accordingly, the ALJ did not err by omitting from his opinion a discussion of the irrelevant and duplicative treatment records of Dr. Glass and Dr. Ponnappan.

### 2. Dr. Chamberlain, Ms. Boileau, and Ms. Kazmarck

Plaintiff claims that the ALJ improperly discounted the opinion of Ms. Kazmarck and failed to adequately consider the treatment records of Dr. Chamberlain and Ms. Boileau. (Pl. Br. at 28.) Because, among other reasons, the treatment of each of these therapists was discussed or referenced in the ALJ's decision, the Court finds that the ALJ did not err in his consideration of the record.

The ALJ may consider opinions about a claimant's disability from therapists, irrespective of whether they are licensed or certified; however, a treating therapist's opinion is not entitled to controlling weight. <u>Hartranft v. Apfel</u>, 181 F.3d 358, 361 (3d Cir. 1999); <u>compare</u> 20 C.F.R. § 416.913(d) ("[W]e may also use evidence from other sources . . . [including] therapists . . . .") <u>with</u> § 404.1527(d)(2) ("Although we consider opinions from medical sources . . ., the final responsibility for deciding these issues is reserved to the Commissioner."). When considering the progress notes of treating

therapists, the ALJ is not required to detail the intricacies of their consideration so long as the ALJ's discussion permits "meaningful judicial review." See Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000).

Ms. Kazmarck was the only treating social worker to provide a formal assessment of Plaintiff's residual functional capacity with regards to his psychological limitations. (R. at 826-28.) Although the ALJ tacitly approved Ms. Kazmarck's opinion as to Plaintiff's "good" abilities, he expressly discounted her opinion as to Plaintiff's "poor" and "fair" abilities. (R. at 16.) The ALJ rejected certain of Ms. Kazmarck's opinions that were inconsistent with "the weight of the clinical findings and diagnostic studies." (Id.) Further, the ALJ categorized Ms. Kazmarck's report as "a well-intentioned effort to help the claimant gain disability payments . . . [that is] not persuasive." (Id.) (citations omitted)

Plaintiff argues that the ALJ erred in his consideration of Ms. Kazmarck's assessment. Specifically, Plaintiff points to several excerpts from Ms. Kazmarck's notes that elaborate on Plaintiff's condition, claiming that the ALJ failed to properly consider the severity of his psychological issues. (Pl. Br. at 32-33.) Notably, Plaintiff asserts that "the ALJ should explain the weight given to Ms. Kazmarck's findings and opinions and the reasons for discounting the opinion." (Pl. Br. at 32).

22

Plaintiff's assertion that the ALJ failed to explain the weight given to Ms. Kazmarck's findings is directly contradicted by the record. The ALJ specifically addressed why he discounted portions of Ms. Kazmarck's opinion: they were inconsistent with the clinical findings and diagnostic studies and appeared to be an artificial effort to assist Plaintiff in obtaining disability benefits. (R. at 16.) In light of this clear explanation as to why the ALJ discounted Ms. Kazmarck's opinion, which is consistent with the applicable regulations and SSR 06-03p, Plaintiff's argument to the contrary is meritless. While "information from . . . 'other sources' . . . may provide insight into the severity of the impairment(s)," the ALJ appropriately exercised his discretion in discounting portions of Ms. Kazmarck's opinion. See SSR 06-03P, 2006 WL 2329939 (S.S.A. Aug. 9, 2006).[3]

Next, Plaintiff argues that the ALJ failed to properly consider Dr. Chamberlain's treatment records. (Pl. Br. at 33.) Plaintiff alleges that Dr. Chamberlain's progress notes are probative of the severity of Plaintiff's mental limitations and support Ms. Kazmarck's assessment of Plaintiff's residual functional capacity. (Id. at 35.) Plaintiff concludes, "The ALJ

---

[3] Moreover, the ALJ adopted portions of Ms. Kazmarck's opinion that he found consistent with the overall record, including Plaintiff's difficulty dealing with stress and his limited ability to interact with others in the workplace and in public.

should have discussed and analyzed the findings of Dr. Chamberlain and his failure to do so is improper." (<u>Id.</u>)

Although the ALJ did not discuss Dr. Chamberlain's course of treatment in great detail, Plaintiff's arguments are unpersuasive. The ALJ noted that Dr. Chamberlain treated Plaintiff and diagnosed him with dysthymia and cannabis dependence, prescribing medications including Wellbutrin. (R. at 15.) The ALJ's reference to Dr. Chamberlain, albeit brief, makes clear that he considered Dr. Chamberlain's treatment, and nothing more is required. The relevant inquiry on appeal is not whether the ALJ thoroughly discussed every source in the record; rather, it is whether the ALJ sufficiently explained the factual basis for his conclusion and whether that conclusion is supported by substantial evidence. <u>Fargnoli</u>, 247 F.3d at 38. The ALJ thoroughly discussed Plaintiff's mental health treatment at the VAMC by Ms. Kazmarck, Dr. Chamberlain, and Ms. Boileau and incorporated Plaintiff's psychological limitations into his residual functional capacity by finding that Plaintiff is limited to only occasional interaction with co-workers, supervisors, and the general public. Notably, Plaintiff has not identified anything in Dr. Chamberlain's treatment records that contradict the ALJ's findings or that compel the conclusion that the ALJ's residual functional capacity finding was not supported by substantial evidence.

24

Further, Dr. Chamberlain did not assess Plaintiff's ability to work. Plaintiff points to no place in the record where Dr. Chamberlain expressed an opinion about his ability to perform non-skilled work for an eight-hour workday. Without an opinion that is directly probative of Plaintiff's residual functional capacity, Dr. Chamberlain's records are only persuasive to the extent they illuminate some significant issue that cannot be surmised by the portions of the record cited by the ALJ. A review of Dr. Chamberlain's treatment records does not reveal any psychiatric conditions that would prevent Plaintiff from obtaining and keeping employment; thus, the ALJ did not err in his evaluation of Dr. Chamberlain's course of treatment.

Plaintiff also claims that the ALJ failed to "mention, discuss and/or analyze the records of Melonie Boileau . . . [,]" who provided psychotherapy to Plaintiff. (Pl. Br. at 35.) Plaintiff argues that Ms. Boileau's findings are probative of Plaintiff's anxiety, depression, and narcissistic traits. (Id. at 37.)

Plaintiff's assertion that the ALJ failed to reference Ms. Boileau's records is inaccurate. The ALJ notes in his discussion of Plaintiff's mental health treatment that "[o]n July 22, 2010, the claimant told another social worker, Melonie Boileau, that the post office had called him back to work (after firing him for leaving work early)." (R. at 16.) The ALJ's decision also

contains references and citations to Ms. Boileau's notes. (R. at
17) (citing Exhibit 26F, pages 2 & 61). The ALJ noted that
Plaintiff discussed his education and work options with social
workers at the VAMC, often without mention of any physical or
psychological limitations. (Id.) Specifically, the ALJ cited Ms.
Boileau's notes from a March 9, 2011 meeting with Plaintiff in
which Plaintiff discussed the possibility of working at Federal
Express without mention of any physical inability. (Id.) The
ALJ's citations to Ms. Boileau's notes demonstrate a thorough
contemplation of the entire record and Plaintiff's arguments to
the contrary must fail absent anything in Ms. Boileau's notes
that directly contradicts the ALJ's residual functional capacity
determination. As noted above, far from ignoring Plaintiff's
mental health treatment and diagnoses, the ALJ found Plaintiff's
depression to be a severe impairment and incorporated
Plaintiff's associated symptomatology into his residual
functional capacity determination by limiting Plaintiff to goal-
oriented tasks in a stable workplace with limited interaction
with co-workers and the general public.

Furthermore, like Dr. Chamberlain, Ms. Boileau did not
provide a formal assessment of Plaintiff's residual functional
capacity. Absent any clear evidence in Ms. Boileau's notes that
Plaintiff was unable to perform any work, the Court finds no

reason to compel the ALJ to expressly discuss these notes in his opinion.

### 3. Dr. Hairston

Plaintiff claims that the ALJ did not give proper weight to the findings of Dr. Hairston. (Pl. Br. at 28.) Plaintiff alleges that Dr. Hairston's records demonstrate Plaintiff's inability to work, which the ALJ failed to recognize. Plaintiff argues that the ALJ mischaracterized and/or failed to consider Dr. Hairston's treatment notes. (Pl. Br. at 38–40; Pl. Reply at 7–8.) The Court finds no error in the ALJ's consideration of Dr. Hairston's treatment records.

Under applicable regulations and the law of the Third Circuit, "opinions of a claimant's treating physician are entitled to substantial . . . weight." Fargnoli, 247 F.3d at 43; see also 20 C.F.R. § 404.1527(d)(2). A treating physician's opinion on the nature and severity of a claimant's impairment can even be controlling, as a matter of law, when that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. If, however, a treating physician's opinion is contradicted by other medical evidence in the record, including the opinion of a non-treating physician, the ALJ may accept the most credible medical

opinion. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999);
Yensick v. Barnhart, 245 F. App'x 176, 181 (3d Cir. 2007).

It is important to note that the ALJ did not summarily
dismiss Dr. Hairston's records or conclusions; rather, he
incorporated Dr. Hairston's records into the determination of
Plaintiff's residual functional capacity. With respect to
Plaintiff's physical limitations, the ALJ considered the
progress notes of Dr. Hairston in conjunction with the objective
medical evidence and the non-treating opinion of the state
agency medical consultant.

The ALJ discussed Plaintiff's course of treatment with Dr.
Hairston in detail. The ALJ relied on Dr. Hairston's notes for
several conclusions about Plaintiff's condition, which he then
incorporated into his determination of Plaintiff's residual
functional capacity: he was stable neurologically with normal
muscle strength and gait (R. at 14); he had a moderate narrowing
of the left neural foramin and mild narrowing of the right
neural foramin and central canal (R. at 15); he had grade I
spondylolisthesis at L5-S1 (id.); his left shoulder had mild
osteoarthritis and mild tendinosis with a small tear (id.); and
he obtained "excellent relief" from trigger point injections (R.
at 17.).

It is evident that the ALJ considered Dr. Hairston's
treatment notes in light of the other medical evidence in the

record in determining that Plaintiff could perform sedentary work. The ALJ emphasized a report from the VAMC which stated that Plaintiff's condition was not "overly severe, including normal ranges of motion of the cervical and lumbosacral spines, mild tenderness, no trigger points, and normal muscle strength." (Id.) Furthermore, the ALJ relied heavily on the objective medical evidence in the record, including MRIs conducted on March 6, 2009, March 15, 2010, and November 16, 2010, the results of which he considered to be "mild." (R. at 17.)

The ALJ's opinion does not indicate, nor does an independent review of the record reflect, any direct conflict between Dr. Hairston's treatment notes and the ALJ's residual functional capacity determination. The ALJ's opinion does not conclude that Plaintiff suffers from no physical limitations. Rather, the ALJ found that Plaintiff can perform a range of less exertional physical tasks throughout the course of an eight-hour work day. For example, Plaintiff argues that the ALJ ignored Dr. Hairston's recommendation that Plaintiff not sit for any prolonged period of time, yet the ALJ found that Plaintiff needed to change position every 15 minutes. Despite Plaintiff's contentions to the contrary, Dr. Hairston's evaluation records do not undermine the ALJ's conclusions or suggest that the ALJ's residual functional capacity determination was unsupported by substantial evidence. Instead, the ALJ clearly relied on Dr.

Hairston's treatment in determining Plaintiff's residual
functional capacity.

Plaintiff claims that the ALJ failed to discuss "Dr.
Hairston's impressions of myofascial pain syndrome, sacroiliac
joint dysfunction and discogenic syndrome." (Pl. Reply at 7–8.)
Plaintiff is correct that some of these notes reflect
impressions, which the ALJ did not specifically discuss. (R. at
425.) There is no indication, however, that the ALJ did not
consider these impressions when reviewing the record as a whole.
Plaintiff's argument is belied by the ALJ's extensive citation
to Dr. Hairston's progress notes, including reference to factual
material in Dr. Hairston's records which appear, in many
instances, on the same page as the impressions identified by
Plaintiff and allegedly ignored by the ALJ. (See, e.g., R. at
425, 429) (listing Dr. Hairston's impressions, along with
statements that Plaintiff received relief from trigger point
injections, had normal gait, normal coordination, and was stable
neurologically). More importantly, Plaintiff fails to explain
how the identified impressions would have changed the ALJ's
residual functional capacity determination. Absent evidence in
the record which conflicts with or otherwise undermines the
ALJ's well-supported findings, the Court finds no error.

Plaintiff also claims that the ALJ improperly characterized
Dr. Hairston's records when he stated that Plaintiff had

exacerbations *and* remissions. (Pl. Reply at 8.) Plaintiff claims that he did not actually have any "true remissions" for more than short periods of time. Plaintiff only supports this proposition by citing to his own subjective complaints of pain. (Id.) For reasons more fully set forth below, Plaintiff's subjective complaints of pain are insufficient to overcome the ALJ's findings after his careful consideration of the record.

### 4. Dr. Tillman and Dr. Kahanowicz

Plaintiff also argues that the ALJ erred in assigning great weight to the opinions of the state agency medical consultants who reviewed the case, Dr. Tillman and Dr. Kahanowicz. (Pl. Br. at 42-46.) Neither of these state consultants had the opportunity to examine Plaintiff, and they provided opinions based only upon their review of the record. Importantly, each report was reviewed and confirmed by a second independent state agency consultant. (R. at 15-16.)

The opinions of state agency medical consultants merit significant consideration. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011) (citing 20 C.F.R. §§ 404.1527(f) and 416.927(f)). The ALJ is required to evaluate and discuss the weight given to state agency medical consultants in the same manner as they are required to discuss the opinions of treating medical and non-medical sources. 20 C.F.R. § 404.1527(e)(2)(ii). When determining whether an ALJ properly considered the opinion

31

of a state agency consultant, indications that the ALJ incorporated other sources into his or her determination can be particularly probative. See Chandler, 667 F.3d at 361-62 (noting, as important, that the ALJ incorporated the opinions of a treating nurse and did not merely "rubber stamp" a state agency consultant's conclusion).

The Court thus considers whether the ALJ incorporated various aspects of the record into his decision or whether he merely "rubber-stamped" the conclusions of the state consultants.

When viewing the ALJ's opinion as a whole, it is clear that the he credited Dr. Kahanowicz and Dr. Tillman's opinions because they were supported by the weight of the objective medical evidence in the record.[4] The ALJ's discussion of these state consultants is preceded by nearly four pages detailing Plaintiff's treatment history. As discussed above, the ALJ considered and incorporated numerous treating and non-treating sources from Plaintiff's extensive treatment records in his analysis, including the records of Dr. Hairston, Ms. Kazmarck, Ms. Boileau, Dr. Chamberlain, and doctors at the VAMC. The ALJ's thorough examination of the record as a whole indicates that he

---

[4] The decision states, near the end of the step four determination, that "[t]he physical assessment of Dr. Kahanowicz, and the psychiatric assessment of Dr. Tillman, are supported by the weight of the evidence, and are entitled to great weight. (R. at 17.)

did not merely rubber-stamp the conclusions of the state agency consultants. As stated, the ALJ found the opinions of the state consultants supported by the weight of the evidence and thus afforded them due weight. Accordingly, the Court finds that the ALJ's treatment of the state consultants is supported by substantial evidence and thus proper irrespective of whether there is some evidence in the record that does not support his final determination. That is the nature of the substantial evidence standard of review. It is not for the Court upon review to weigh the evidence or substitute its own conclusions for those of the ALJ, so long as substantial evidence in the record, taken as a whole, supports the ALJ's conclusions. Id. at 359.

### 5. Plaintiff's testimony

Mr. Craig claims that the ALJ failed to properly consider his own testimony at the administrative hearing, particularly his subjective complaints of pain. He relies heavily on Social Security Ruling 96-7P, which outlines the appropriate methodology for determining the credibility of a claimant's testimony. See generally, SSR 96-7P: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186 (S.S.A. July 2, 1996). In his decision, the ALJ determined that Plaintiff was only "partially credible" as a witness (R. at 17.) The ALJ based this conclusion

on several inconsistencies in Plaintiff's testimony concerning his previous employment and social life.

SSR 96-7P is clear that subjective complaints of pain cannot be the sole basis for a finding of disability; there must be objective evidence that clearly demonstrates a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 96-7P, at *1. If the claimant's symptoms are corroborated by an underlying medical impairment, the ALJ must determine the extent to which those symptoms limit the claimant's ability to perform basic work activities. Id. at *2. Such a determination is inherently contingent on the credibility of the claimant's testimony as to the severity of his or her symptoms and the limitations those symptoms impose.

Plaintiff broadly asserts that the ALJ failed to analyze or consider several of the factors provided by SSR 96-7P. (Pl. Br. at 48.) Specifically, Plaintiff alleges the ALJ failed to discuss the longitudinal record of Plaintiff's treatment with Dr. Hairston. (Id. at 49.) Plaintiff also claims that his testimony is supported by the progress notes of his various treating clinicians. (Id.)

Plaintiff's only specific contention, that the ALJ failed to analyze the longitudinal record of his treatment with Dr. Hairston, is baseless. The ALJ's opinion relies heavily on Dr.

34

Hairston's treatment records in determining Plaintiff's residual functional capacity. (R. at 14–17.) Although acknowledging that Plaintiff may experience some degree of subjective pain and depression, the ALJ pointed to objective diagnostic studies that indicate Plaintiff's condition is mild, and "not of such severity, frequency, or duration as to preclude the performance of a range of sedentary work." (R. at 16.)

Further, Plaintiff claims his testimony was improperly discredited based on factual inconsistencies that were immaterial to his ability to work. (Pl. Br. at 47.) The clear language of SSR 96–7P undermines this assertion. SSR 96–7P emphasizes the importance of consistency in a witness's testimony when determining credibility: "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96–7P, at *5. SSR 96–7P states that the ALJ must consider whether the individual's statements are consistent with (1) the medical findings, (2) his own statements, and (3) other information in the record. Id. See also Horodenski v. Comm'r of Social Sec., 215 F. App'x 183, 188 (3d Cir. 2007) ("The ALJ's determination not to credit [the Plaintiff's] claim of total disability is further supported by inconsistencies in [the Plaintiff's] testimony.").

The ALJ points to two distinct instances where Plaintiff's testimony directly contradicted information readily available in the record. (R. at 17.) With regards to his physical limitations, Plaintiff testified to experiencing debilitating back pain and that he left his job at the post office due to this pain; however, this testimony was inconsistent with records that reveal he was actually terminated from his post office position. (Id.) With regards to psychological limitations, Plaintiff testified to losing all his friends. The ALJ found this testimony inconsistent with evidence in the record that Plaintiff still smokes marijuana with his "buddies" and traveled to Florida with his girlfriend. (Id.) Importantly, the ALJ referred to specific treatment notes in the record that reflect Plaintiff's inconsistent testimony. (Id.)

In light of these inconsistencies, the ALJ did not err in his assessment of Plaintiff's credibility. SSR 96-7P details the need to assess the consistency of a claimant's testimony with statements made by the claimant to treating medical or non-medical personnel. SSR 96-7P, at *5. Upon hearing certain testimony by Plaintiff at the administrative hearing, the ALJ confronted Plaintiff with contradictory evidence from the record, including treatment records from the VAMC that reflect conversations between Plaintiff and treating medical and non-medical personnel. The guidance contemplates and emphasizes the

need for these types of corresponding documents when determining
the credibility of a claimant. The ALJ's review of the record
and subsequent disregard for portions of Plaintiff's testimony
that he found to be inconsistent with other evidence in the
record was therefore appropriate and supported by substantial
evidence. This is precisely what the ALJ should do when
determining credibility of a claimant.

### B. Any error at step two was harmless

Plaintiff also argues that the ALJ erred at step two by
failing to include Plaintiff's isthmic spondylolisthesis,
impulse control disorder, anxiety, and personality disorder in
the list of "severe" impairments that limit Plaintiff's
abilities.

Defendant correctly notes that even if the ALJ failed to
appropriately compile a comprehensive list of impairments that
qualify as "severe", under-inclusion at step two constitutes
harmless error. See, e.g., Salles v. Comm'r of Soc. Sec., 229 F.
App'x 140, 149 n.2 (3d Cir. 2007) ("Because the ALJ found in
[Plaintiff]'s favor at Step Two, even if he had erroneously
concluded that some of h[is] other impairments were non-severe,
any error was harmless."); Barlow v. Comm'r of Soc. Sec., Civ.
13–538, 2014 WL 1225560, at *7 (D.N.J. Mar. 24, 2014) ("[A]ny
error at step two was harmless because the ALJ continued the
sequential analysis."). This principle is readily applicable to

Plaintiff's argument. "Because any error was harmless, the Court need not assess whether the ALJ's step two determination was actually erroneous." Id. (citing Williams v. Comm'r of Soc. Sec., Civ. 12-5673, 2013 WL 4500335, at *18 n.7 (D.N.J. Aug. 21, 2013). Because the ALJ continued his analysis beyond step two, the Court need not consider whether it was error to omit certain other impairments.

The parties correctly note that the ALJ is required to consider the cumulative effect of all impairments Plaintiff suffers from, regardless of the severity for purposes of step two, in the remainder of its analysis. See 20 C.F.R. § 404.1523. Plaintiff does not, however, argue that the ALJ failed to consider his additional limitations in steps three, four, and five. Absent such an argument by Plaintiff, the Court need not address whether the ALJ failed to consider Plaintiff's isthmic spondylolisthesis, impulse control disorder, anxiety, and personality disorder in the remainder of the analysis. Nevertheless, a review of the record makes clear that the ALJ considered all of Plaintiff's alleged impairments, including those not deemed "severe" at step two, in the remainder of the analysis.

## V. CONCLUSION

In light of the foregoing, the Court will affirm the Commissioner's denial of Social Security disability benefits

because the ALJ's residual functional capacity determination is supported by substantial evidence and any error at step two was harmless. An accompanying Order will be entered.


__November 21, 2014__                    __s/ Jerome B. Simandle__
Date                                     JEROME B. SIMANDLE
                                         Chief   U.S.   District   Judge